HELEN ELIZABETH HORTON, petitioner,

*v.*

JOHN WESLEY HORTON, defendant.

[Decided July 18th, 1924.]

**Divorce—Adultery—Evidence—Hearsay—Leading Questions—Proper Certificates of Official Character—Duty of Special Masters.**

On petition for divorce. On final hearing on master's report and depositions *ex parte.*

*Mr. Daniel D. Loeb,* for the petitioner.

WALKER, CHANCELLOR,

This is a petition for divorce for adultery. The proofs show that the petitioner and defendant were married April 3d, 1918, and that defendant afterwards went through a form of a ceremony of marriage with Lillian McIntyre, May 21st, 1919; that the petitioner and defendant separated on account of this woman. Petitioner says that on the day President Harding died (date not given) she read in a newspaper about her husband being arrested with Lillian McIntyre: that she went to police headquarters to inquire, and *they* told her that his wife had been arrested for robbery in Spring Lake, New Jersey, and had a marriage certificate in her trunk, which was seized. Of course, she could say that she read in a newspaper that they were arrested, but there the hearsay would have to stop, and what she did in consequence she could tell, confining her testimony to her own actions and to facts within her own knowledge, and such facts as were not known to her personally could only be spoken to by those who did know them. The petitioner goes on to testify that on account of the robbery defendant was

convicted and sentenced at Freehold, New Jersey, to the state prison at Trenton, and that she saw him there (state prison). The only admissible testimony on this head is that the petitioner saw the defendant in the New Jersey State Prison. That he was convicted and sentenced at Freehold is the giving of verbal testimony of the contents of a record, which is not, and never has been, admissible. *In re Mc-Craven, 87 N. J. Eq. 28.* Petitioner also testifies that her husband "admitted" to Detective Higgins in New York that she was his first wife. Detective Higgins could lawfully have testified to this, provided he would give the language used and not his conclusion from that language to the effect that it amounted to an admission. That conclusion would be for the court. The testimony coming from the petitioner is hearsay.

Mr. Stubbs, proprietor of the Warren Hotel at Spring Lake, testified that about August 1st, 1923, there was a robbery at the hotel, for which John Wesley Horton was afterwards convicted at Freehold and sent to the state prison at Trenton. Here again we have verbal testimony of the contents of a record. And this was brought about by the asking of leading questions, which is not permissible. He also said that Horton had been a guest at the hotel for about one month; that Lillian McIntyre, known as Rogers, was a chambermaid in the hotel during the same time; that he found out her name was Lillian McIntyre from papers and letter which were in her trunk at the time of the robbery; that he searched her trunk with the detective and found out that she was known as Lillian Horton, as well as Lillian Rogers and Lillian McIntyre. Mr. Stubbs, after saying that he was not present in the Monmouth quarter sessions, was examined as follows:

"*Q.* He pleaded *non vult*, didn't he, or was he convicted by a jury?

"*A.* He finally pleaded guilty and did not stand trial.

"*Q.* Do you know what they did with him?

"*A.* He was sentenced to serve a term in prison for, I think, seven years.

"*Q.* In the State's Prison at Trenton, New Jersey, is that the prison?

"*A.* It must have been."

And this remarkable examination also took place: Mr. Stubbs was speaking about Lillian and was asked and answered as follows:

"*Q.* Did she say anything about his being her husband, or married to him, or living together?

"*A.* Well, it is my impression that she referred to her life with him in such a way that it left the intimation in our minds that they were man and wife.

"*Q.* What made you believe that?

"*A.* She gave me that impression; I cannot remember anything specific; it seems to me that we would not have had this definite thought, which to my mind amounts to knowledge of the fact that they were married, if it had not been confirmed by many different expressions of her own. It seems to me that it was so definitely understood that an expression such as 'he is my husband' would be entirely out of place; she told about her life with him.

"*Q.* Did she say anything about their having lived together somewhere else, outside of the fact that they had been at this hotel; did she say that they had been living together, let us say, in Philadelphia or New York, or some other place; in other words, did they have a home somewhere; did she say that?

"*A.* No, sir; in these letters you will find that the letters show that they were in Cleveland for a time, that they were out in Cleveland or Detroit, and that she worked in a hotel there; and that he was out there at the same time; and then she came back to New York and sent money for him to get back to New York. There are twenty-nine letters here in this bunch, and there are also thirty-four letters and pictures in this other lot."

How any statement of Lillian McIntyre's out of the presence of the defendant, and when he had no opportunity to deny it, can be made evidence, I am at loss to understand. Of course, it cannot. Besides, the witness giving his "impression," and reasoning or arguing about facts tending to show that she and Horton were married, has not the slightest semblance of legal evidence about it. The solicitor should not have elicited, nor the master permitted, such evidence.

The petitioner was recalled and was shown a letter addressed "Dearest Jack," and subscribed, "From a lonesome wife, Lillian," and was asked if she recognized the handwriting. She replied in the affirmative, and was asked, "In whose handwriting is that?" and answered, "It is the handwriting of Lillian McIntyre." Asked how she knew her

handwriting, she said that Lillian was a friend of hers and she knew her handwriting well. That is not the way to prove handwriting. The proper question is: "Did the witness ever see So in So write?" and if the reply is in the affirmative the next question would be, "Do you know her handwriting?" and if the reply is in the affirmative, the next question should be, "In whose handwriting is this and that?" It can be argued that the witness here studiously avoided saying that she had seen Lillian write, and therefore did not lay a foundation for testimony that the letter was in her handwriting. The above criticisms apply to much of the other testimony taken.

Another thing: There are two certificates by the clerk of the orphans court of Philadelphia. They commence, "I, James B. Sheehan, Esquire, register of wills and *ex-officio* clerk of the orphans court of Philadelphia, do certify," &c., and are signed "William F. Campbell, register of wills and *ex-officio* clerk of orphans court." And this follows a certificate by Hon. Joseph T. Lamorelle, president judge of the orphans court, that James B. Sheehan, Esquire, is register of wills and clerk, &c. Of course, this will have to be corrected.

Besides the case *In re Craven, supra,* which holds that the rules of evidence which do not permit of leading questions, characterizations, hearsay and conclusions, and which require that facts only may be testified to by witnesses, leaving all inferences to be suggested by way of argument and to be decided by the court, apply as well to *ex parte* cases as to litigated ones, I sent a circular letter to the special masters on April 5th, 1923, which is *Appendix No. 2 to the Rules of 1923 p. 112,* in which I admonish them not to permit the taking of hearsay or other incompetent testimony; but, I regret to say, that neither the decision nor the letter is being complied with to the extent that I had hoped and expected. In several recent cases I have taken occasion to send back the records to the master, with leave to take the depositions *de novo* according to law and the rules of evidence, and that

will be done in this case. Divorces will not be granted on illegal testimony.

From what has been said in the above memorandum, it would appear that this case is susceptible of legal proof.